UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROBERT AMASON, D.D.S., P.C.,                CIVIL ACTION
ET AL.

VERSUS                                      NO: 06-2933

OCA, INC., ET AL.                           SECTION: R(3)


## ORDER AND REASONS

Before the Court is plaintiffs' Motion for Summary Judgment. For the following reasons, the Court GRANTS the motion.


**I.    Background**

**A.    Factual Background**

This matter arises out of business relationship between a private orthodontic practice, Robert M. Amason, D.D.S., P.C. (Amason), and its provider of business, financial, and office management services, Orthodontic Centers of America, Inc. (OCA). OCA operates through a network of wholly owned subsidiaries named according to the states in which OCA does business (*e.g.*,

Orthodontic Centers of Alabama, Inc.).  Through its subsidiaries, OCA entered into long-term business service agreements (BSAs) with doctors in about 250 practices nationwide to provide office management and patient billing support, among other services. Under the BSAs, the doctors pay OCA a monthly fee based upon a percentage of their operating profit or practice revenue.   The BSAs are OCA's primary asset and the source of nearly all of its revenue.

**B.   Business Service Agreement**

In 1997, Dr. Robert Amason, an orthodontist with offices in Alabama, entered into a BSA with OCA. (R. Doc. 92-4 at ¶4).  OCA agreed to provide a range of office and business services under the BSA in exchange for what is designated in the BSA as a "service fee."  Essentially, the arrangement was for OCA to take care of business functions so that the doctors could practice medicine free of administrative hassles.  OCA was responsible for (i) marketing and advertising services; (ii) employment, scheduling and training of office staff; (iii) provision and maintenance of office space, telephones, and utilities; (iv) provision and maintenance of equipment; (v) payroll administration and accounting; (vi) installation of computer hardware and software and training staff in its use; (vii) ordering and management of supplies and inventory; (viii) billing

2

and collections; (ix) bookkeeping, accounting and preparation of financial statements; (x) processing and disbursement of payments for accounts and trade payables; (xi) assistance in recruiting orthodontists; (xii) preparation of statistical data and analyses of Center operations; (xiii) legal services for the Center's routine operations; and (xiv) various consulting advice. (BSA at ¶1.1).

The BSA explicitly states that "OCA is not authorized or qualified to engage in any activity that may be deemed or construed to constitute 'the practice of dentistry' under the laws of the State of Alabama." (BSA at ¶1.2). Still, OCA held exclusive control over Amason's orthodontic revenues and controlled the disbursement of funds from the practice's bank account. (BSA at ¶1.8). In addition, OCA owned Amason's office equipment and furnishings and leased these items to Amason. (BSA at ¶1.4). The BSA, however, provided that the office equipment and furnishings were to be under the "exclusive control" of Amason. (BSA at ¶1.4). OCA also had a duty to consult with Amason on all of the services it provided. (BSA at ¶1.3).

In the BSA, both parties agreed to covenants not to compete. (BSA at ¶¶ 5.1-5.2). The BSA was to last for a term of 25 years. (BSA at ¶4.1). The BSA also contained a choice of law provision which stated that the laws of Alabama shall govern the validity

3

and interpretation of the agreement. (BSA at ¶8.5).

**C.   Service fee arrangement**

Under the BSA, Dr. Amason agreed to pay OCA according to a detailed formula.  For the first 36 months the fee was to be the difference of the following amounts:

(1) Patient Revenue, less

(2) the Initial Minimum PC Amount, less

(3) the amount, if any, by which the Initial Alternative PC Amount Exceeds the Initial Minimum PC Amount.

(BSA at ¶3.1).  "Patient Revenue" is defined as 24.12% of the aggregate total balance of all fees and charges paid by patients, plus a portion of each patient contract. (BSA at ¶3.1(c)(viii)). The "Initial Minimum PC Amount" means $37,945 annually. (BSA at ¶3.1(c)(v)).  The "Initial Alternative PC Amount" means the aggregate sum of (A) the Base Compensation Amount, plus (B) 50% of the Net Operating Margin for the applicable period. (BSA at ¶3.1(c)(iv)).  The "Base Compensation Amount" is $83.33 per patient hour. (BSA at ¶3.1(c)(i)).  The "Net Operating Margin" is the total amount of money collected in patient revenue, minus the sum of the following expenses: (1) Center expenses; (2) the Base Consulting Fee; (3) the Base Compensation Amount; and (4) 50% of the Total Acquisition Cost. (BSA at ¶3.1(c)(vi)).  The "Base

4

Consulting Fee" is $22.22 per patient hour. (BSA at ¶3.1(c)(ii)).

     After the first 36 months, the fee was to be the difference of the following amounts:

     (i) Patient Revenue, less

     (ii) the sum of (A) the Base Compensation Amount, plus

     (B) 50% of the Net Operating Margin.

(BSA at ¶3.1(b)).

###     D.   Procedural Background

     On March 14, 2006, OCA and its subsidiaries filed for bankruptcy.  On May 19, 2006, the plaintiffs sued OCA seeking declaratory relief and damages for breach of contract and breach of fiduciary duty. (R. Doc. 1-3).  OCA counterclaimed, seeking declaratory relief that the contract was valid, and damages for breach of contract, conversion, unjust enrichment, and quantum meruit. (R. Doc. 90).  Plaintiffs filed for summary judgment in Bankruptcy Court, on the grounds that the BSA was illegal under Alabama law, and Judge Brown denied the motion for the reasons assigned at oral argument. *In re OCA, Inc., et al.*, No. 06-1128 (Bankr. E.D. La. May 2, 2007).  On November 5, 2007, after discovery was completed in the Bankruptcy Court, the Court issued an Order withdrawing the reference to the Bankruptcy Court. (R. Doc. 74).  On March 28, 2008, Amason moved for summary judgment on the issue of whether the BSA is invalid and unenforceable

under Alabama law. (R. Doc. 91).

## II.  Legal Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 325; *Lavespere,* 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex,* 477 U.S. at 324.  The nonmovant may not rest

upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).


## III. Discussion

### A. Bankruptcy Court's Denial of Summary Judgment

OCA contends that Amason's motion for summary judgment should be denied since Judge Brown of the Bankruptcy Court already heard and denied the same motion.  In general, successive motions for summary judgment are disfavored. *See Allstate Finance Corp. v. Zimmerman*, 296 F.2d 797, 799 (5th Cir. 1961).  The district court, however, has discretion to allow successive motions for summary judgment. *See Enlow v. Tishomingo County, Miss.*, 962 F.2d 501, 507 (5th Cir. 1992).  Here, plaintiffs first filed for summary judgment in the Bankruptcy Court.  If plaintiffs had appealed the Bankruptcy Court's order pursuant to 28 U.S.C.A. § 158 (a)(3), rather than moving to withdraw the reference to the Bankruptcy Court, the Court would have reviewed the denial of summary judgment *de novo*. *See In re National Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000).  Since the Court could have ruled on an appeal of the motion *de novo*, the Court finds no reason not to consider plaintiffs' motion for summary judgment.

7

**B.    The invalidity of the BSA under Alabama's professional corporation statute**

Neither party disputes that a partnership between Amason and OCA would be illegal.  Under Alabama law, domestic professional corporations may be organized "only for the purpose of rendering professional services and services ancillary thereto within a single profession, . . ." Ala. Code § 10-4-383.  Only "qualified persons" may own shares in domestic corporations. Ala. Code § 10-4-388.  The statute defines "qualified persons" as:

> a. An individual who is authorized by law of Alabama or of any qualified state to render a professional service permitted by the articles of incorporation of such professional corporation;
>
> b. A general partnership in which all of the partners are qualified persons with respect to such corporation; and
>
> c. A professional corporation, domestic or foreign, in which all the shareholders are qualified persons with respect to the professional corporation.

Ala. Code. § 10-4-382.  The Commentary further explains that the restriction of ownership to qualified persons "enforces the traditional rule that only professionals may share in the profits of practicing the professions."  Accordingly, only qualified persons, that is, other licensed dentists, may own a share in a dental partnership.  It is undisputed that OCA is not a

8

"qualified person" under Alabama law, in that it is not a professional corporation in which all shareholders hold a dental license.  Therefore, if OCA and Amason are partners, as Amason contends, their business arrangement violates Section 10-4-388.

Alabama law provides that "an association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intended to form a partnership." Ala. Code § 10-8A-202.  The statute further provides:

> (c) In determining whether a partnership is formed, the following rules apply:
>
> ***
>
> (2) The sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived.
>
> (3) A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment:
>
>> ***
>>
>> (ii) for services as an independent contractor or of wages or other compensation to an employee;
>>
>> (iii) of rent;

\*\*\*

Ala. Code. § 10-8A-202(c).  "There is no settled test for determining the existence of a partnership." *Norman v. Montgomery Wholesale Lumber*, 678 So.2d 1110, 1113 (Ala. Civ. App. 1996) (citing *Vance v. Huff*, 568 So.2d 745, 748 (Ala. 1990)).  In determining whether a partnership exists, "each case must be decided according to it on peculiar facts." *Adderhold v. Adderhold*, 426 So.2d 457, 460 (Ala. Civ. App. 1983).  Alabama courts look to "all the attendant circumstances, including the right to manage and control the business." *Norman*, 678 So.2d at 1113 (citing *Vance*, 568 So.2d at 748). *See also Horton v. Kimbrell*, 819 So.2d 601, 603 (Ala. 2001) ("The 'interest' of a partner 'consists of rights against the other partners to share in profits, participate in management, and receive the benefit of their services.'") (quoting 1 Alan Bromberg & Larry Ribstein, *Bromberg & Ribstein on Partnership* § 3.06, at 3:129 (2001)).  In *Norman*, the court held that evidence that defendant not only shared in profits and losses, but also supervised a building site, negotiated with subcontractors, controlled the business's finances, and signed contracts was sufficient to establish a partnership in a construction business. 678 So.2d at 1113.

The Court finds that the BSA creates an illegal partnership

10

between OCA and Amason.  Although OCA claims that its fee was "calculated based on a specific formula to arrive at a fair compensation," OCA and Dr. Amason were essentially sharing profits.  OCA's fee was the difference between the practice's patient revenue, and 50% of the net operating margin plus the doctor's base compensation. (BSA at ¶3.1).  Thus both parties share the operating expenses and the practice's profits and losses.  Profit-sharing creates a rebuttable presumption of partnership. *See* Ala. Code § 10-8A-202.

Although the agreement provides that OCA's remuneration was payment for its services as an independent contractor (BSA at ¶5.9), OCA's rights with regard to the management and control of the business show that the arrangement was indeed a partnership. Like the defendant in *Norman*, OCA controlled the practice's finances (BSA at ¶¶1.7-1.8) and negotiated contracts on its behalf. (BSA at ¶1.10).  OCA had numerous other managerial responsibilities under the BSA.  OCA was responsible for employing and training office staff, providing and maintaining office space, marketing and advertising, and administering the practice's payroll. (BSA at ¶1.1).  OCA handled all bookkeeping tasks for the practice and handled all billing and collections. (BSA at ¶¶1.7-1.9).  OCA leased the practice's office space and provided the furniture and equipment for the office. (BSA at

11

¶¶1.4-1.5).   OCA required the practice to be open at least 36
hours per week, and it required the staff to keep a dress code
consistent with its guidelines. (BSA at ¶¶ 2.4 and 2.5).   As
such, OCA effectively operated and controlled the business
aspects of the practice.   Since the BSA gives OCA such a high
degree of control over the practice and a share in the practice's
profits, the agreement creates a partnership, even if the parties
did not intend to create one. *See* Ala. Code § 10-8A-202.
Therefore, as OCA is not a "qualified person" under Alabama law,
its partnership interest in a professional corporation violates
Section 10-4-388.

## C.    The invalidity of the BSA under The Alabama Dental Practices Act

Alabama's Dental Practices Act regulates the practice of
dentistry, in the interest of the public health, safety, and
welfare. Ala. Code § 34-9-2.   Section 34-9-9 provides:

(a) No person other than a dentist licensed pursuant to
this chapter may:

(1) Employ a dentist, dental hygienist or both in
the operation of a dental office;

(2) Place in the possession of a dentist, dental
hygienist or other agent such dental material or
equipment as may be necessary for the management
of a dental office on the basis of a lease or any

12

      other agreement for compensation for the use of
      such material, equipment or offices; or

      (3) Retain the ownership or control of dental
      equipment, material, or office and make the same
      available in any manner for the use of a dentist,
      dental hygienist or other agent. . .

      (5) Nothing in this subsection shall apply to bona
      fide sales of dental equipment, material or office
      secured by a chattel mortgage or retention title
      agreement, or to an agreement for the rental of
      the equipment or office by bona fide lease at a
      reasonable amount, and under which agreement the
      licensee under this chapter maintains complete
      care, custody, and control of said equipment and
      his practice. . .

Ala. Code § 34-9-9(a).  Subsection (b) explains that the purpose

of the provision is "to prevent a non-dentist from influencing or

otherwise interfering with the exercise of a dentist's

independent professional judgment." Ala. Code § 34-9-9(b).

Subsection (b) further provides:

      [N]o person, other than a dentist licensed in
      accordance with this chapter, shall enter into a
      relationship with a person licensed under this chapter
      pursuant to which said unlicensed person exercises
      control over the following:

      (1) The selection of a course of treatment for a
      patient, the procedures or materials to be used as a
      part of such course of treatment, and the manner in
      which such course of treatment is carried out by the
      licensee;

      (2) The patient records of a dentist;

(3) Policies and decisions relating to pricing, credit, refunds, warranties and advertising; and

(4) Decisions relating to office personnel and hours of practice.

Ala. Code § 34-9-9(b).  In addition, the Act provides that disciplinary action shall be taken against dentists who are "guilty of division of fees," except the division of fees between dentists in a partnership or when one licensed dentist employs another. Ala. Code § 34-9-18(a)(9).

The Court has found no case law, in Alabama or elsewhere, that interprets the relevant statutory provisions.  The Court must thus engage in statutory construction.  An Alabama case interpreting an earlier, similar statute is instructive.  In *Weill v. State ex rel. Gaillard*, the Alabama Supreme Court found that defendant Murray Weill's method of making dentures violated Alabama's statutory prohibition against practicing dentistry without a license. 34 So.2d 132, 138 (Ala. 1948).  The statute at issue prohibited persons other than licensed dentists from constructing dentures made from impressions taken by licensed dentists without instructions or authorization. *Id.* at 134. Weill had a business called Serv-U-Dental Laboratory in which he constructed dentures from models or casts prepared from existing dentures, which had themselves been made from an impression taken

14

by a licensed dentist. *Id.* at 137-38.  In deciding that Weill's business was prohibited by the statute, the Alabama Supreme Court stressed that in interpreting statutes, "the legislative will is the all important or controlling factor." *Id.* at 136.  The Alabama Supreme Court further found that "the history and purpose of the statutes regulating and safe-guarding the practice of such professions . . . require that a liberal construction be given the statutes . . . to attain the purpose of the enactment." *Id.* at 137.  Accordingly, the Court will interpret the relevant statutory provisions of the Alabama Dental Practices Act with an eye toward the legislature's intent, expressed in the statute, to prevent a non-dentist from influencing or otherwise interfering with the exercise of a dentist's independent professional judgment." *See* Ala. Code § 34-9-9(b).

Under Alabama law, if the terms within a contract are unambiguous, the construction of the contract and its legal effect are questions that may be resolved on summary judgment. *McDonald v. U.S. Die Casting and Development Co.*, 585 So.2d 853, 855 (Ala. 1991).  Here, the Court finds that the terms of the BSA violate the Alabama Dental Practices Act on a number of grounds and thus render the BSA invalid.  First, the BSA violates the subsection of the statute that prohibits persons other than dentists from exercising control over decisions relating to

15

office personnel and hours of practice. *See* Ala. Code § 34-9-9(b)(3)-(4).  Under the BSA, OCA's duties included employment, scheduling, and training of office staff. (BSA at ¶1.1).  OCA employed and provided all office staff other than orthodontists and dental hygienists. (BSA at ¶1.6).  OCA's authority over staff employment decisions was subject to the approval of Amason, but the approval was not to be "unreasonably withheld." (BSA at ¶2.2).  The agreement's mandate that Amason have a reasonable basis for disapproval restricted Amason's complete control over employment decisions.  Thus these provisions allow OCA at least to share control over decisions concerning personnel in violation of the statute.

OCA also exercised some control in Amason's ability to hire other orthodontists.  While the BSA states that Amason's duties included the employment, hiring, termination and compensation of all orthodontists (BSA at ¶2.1), the later terms of the agreement restricted Amason's ability to employ other orthodontists. (BSA at ¶5.8).  Specifically, the BSA prevented Amason from hiring associate orthodontists unless Amason intended to sell the associate an ownership interest in the practice after a reasonable test period. (BSA at ¶5.8).  The BSA also required Amason to consult with OCA on the need to hire any additional orthodontists and provided that OCA would assist in recruiting

16

other orthodontists. (BSA at ¶5.8).  Further, the BSA required the practice to hold minimum office hours (BSA at ¶2.4) and to institute a dress code according to OCA's guidelines (BSA at ¶2.5).  Since these provisions of the BSA unlawfully allow OCA to exercise control over decisions relating to office personnel and hours of practice, the provisions violate Section 34-9-9(b)(3)-(4).

The BSA also violates the provision that prohibits non-dentists from exercising control over policies and decisions related to advertising.  OCA's duties under the BSA included marketing and advertising. (BSA at ¶1.1).  Again, OCA's decisions in this realm were subject to the approval of Amason that was not to be "unreasonably withheld." (BSA at ¶2.2).  The agreement assigned the primary responsibility for advertising to OCA and cabined Amason's discretion over the advertising by requiring Amason to have a "reasonable" basis to disapprove OCA's advertising decisions.  Under these circumstances, the agreement allowed OCA to share control over these decisions in violation of Section 34-9-9(b)(3).

Further, the BSA provided that OCA will "acquire or otherwise arrange for" the equipment and furniture required for the operation of the practice and lease the furniture to Amason. (BSA at ¶1.4).  This provision violates the subsection of the

17

statute that prohibits persons other than licensed dentists from placing dental equipment in the possession of a dentist pursuant to a lease. *See* Ala. Code § 34-9-9(a)(2).  The BSA also provided that OCA would retain exclusive ownership of the dental equipment and maintain the leases of the practice's offices, in violation of Section 34-9-9(a)(3). (BSA at ¶1.4).

These provisions in the BSA are not saved by the statutory clause that expressly allows "an agreement for the rental of the equipment or office by bona fide lease at a reasonable amount, and under which agreement the licensee under this chapter maintains complete care, custody, and control of said equipment." OCA's agreement with Amason does not satisfy the requirement that Amason maintain complete care and control of the equipment. While a provision in the BSA states that Amason "shall have exclusive custody of and control over" the equipment, Amason's control is restricted elsewhere in the agreement. (BSA at ¶1.4). The BSA required Amason to immediately surrender custody of the equipment upon termination of the BSA, which could be for reasons entirely unrelated to the lease agreement. (BSA at ¶¶1.4, 4.2-4.3).  If Amason breached "any duty, obligation, covenant or agreement" in the BSA for a period of 30 days, OCA could end Amason's custody of the equipment. (BSA at ¶4.2).  Thus OCA could

18

take custody of the dental equipment if Amason failed to adopt a dress code in conformance with OCA's guidelines (BSA at ¶2.5) or decided to use a computer system that OCA did not approve. (BSA at ¶2.7).  Further, OCA, not Amason, controlled the maintenance of the equipment, which, without proper upkeep, could affect Amason's treatment of patients.  As such, Amason did not exercise exclusive control pursuant to the lease, and thus this provision of the BSA violates Section 34-9-9(a)(3).

### D.  Severability and enforceability

The illegality of these contract provisions cannot be severed from the other provisions of the BSA.  The BSA contains a clause providing that if a provision of the agreement is held to be illegal, then it shall be severed from the agreement, leaving the remainder effective and binding upon the parties. (*See* BSA at ¶8.8).  Although Alabama courts routinely "excise void or illegal provisions in a contract, even in the absence of a severability clause," *see Sloan Southern Homes, LLC v. McQueen*, 955 So.2d 401, 404 (Ala. 2006), the severed clauses generally are arbitration clauses or other easily severable provisions. *See Johnson v. Jefferson Country Racing Ass'n, Inc.*, __ So.2d __, (Ala 2008), 2008 WL 2554013 at *3 (arbitration clause); *Ex parte Celtic Life Ins. Co.*, 834 So.2d 766, 769 (Ala. 2002) (arbitration clause);

*Wright v. Robinson*, 468 So.2d 94, 98 (Ala. 1985) (confession of judgment clause).  Here, the contractual provisions are not severable.  As the agreement creates a partnership between OCA and Amason, the nature of the business arrangement itself is illegal under Alabama law.  Accordingly, as the very purpose of the BSA is void, the agreement cannot be reformed.

Under Alabama law, a party may not enforce an illegal contract. *See Robinson v. Boohaker*, *Schillaci & Co., P.C.,* 767 So.2d 1092, 1094 (Ala. 2000).  "The law in short will not aid either party to an illegal agreement; it leaves the parties where it finds them." *Id.* (quoting 17 C.J.S. Contracts § 272 at 1188 (1963)).  Here, OCA brought claims of declaratory relief as to the validity of the contract, breach of contract, conversion of the dental equipment OCA owned, unjust enrichment, and quantum meruit. (*See* Amended Counterclaim at ¶¶25-46).  All of these claims are premised on the parties' illegal relationship created under the BSA and are thus unenforceable.  Similarly, Amason's claims for breach of contract and breach of fiduciary duty are also unenforceable.  Accordingly, the Court will leave the parties where it found them.


**IV.  Conclusion**

For the foregoing reasons, the Court GRANTS plaintiffs'
Motion for Summary Judgment.


New Orleans, Louisiana, this <u>24th</u> day of October, 2008

                                         *Sarah Vance*
                                  _____
                                        SARAH S. VANCE
                               UNITED STATES DISTRICT JUDGE