```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

| | |
|---|---|
| ROBERT AMASON, D.D.S., P.C., ET AL. | CIVIL ACTION |
| VERSUS | NO: 06-2933 |
| OCA, INC., ET AL. | SECTION: R(3) |

### ORDER AND REASONS

Before the Court is defendants' motion for reconsideration or, in the alternative, to alter or amend the Court's judgment entered on October 30, 2008. For the following reasons, the Court DENIES the motion.

## I. Background

### A. Factual Background

This matter arises out of business relationship between a private orthodontic practice, Robert M. Amason, D.D.S., P.C. (Amason), and its provider of business, financial, and office management services, Orthodontic Centers of America, Inc. (OCA).

OCA operates through a network of wholly owned subsidiaries named according to the states in which OCA does business (*e.g.*, Orthodontic Centers of Alabama, Inc.). Through its subsidiaries, OCA entered into long-term business service agreements (BSAs) with doctors in about 250 practices nationwide to provide office management and patient billing support, among other services. Under the BSAs, the doctors pay OCA a monthly fee based upon a percentage of their net practice revenue. The BSAs are OCA's primary asset and the source of nearly all of its revenue.

**B.   Business Service Agreement**

In 1997, Dr. Robert Amason, an orthodontist with offices in Alabama, entered into a BSA with OCA. (R. Doc. 92-4 at ¶4). OCA agreed to provide a range of office and business services under the BSA in exchange for what is designated in the BSA as a "service fee." Essentially, the arrangement was for OCA to take care of business functions so that the doctors could practice medicine free of administrative hassles. OCA was responsible for (i) marketing and advertising services; (ii) employment, scheduling and training of office staff; (iii) provision and maintenance of office space, telephones, and utilities; (iv) provision and maintenance of equipment; (v) payroll administration and accounting; (vi) installation of computer hardware and software and training staff in its use; (vii)

ordering and management of supplies and inventory; (viii) billing and collections; (ix) bookkeeping, accounting and preparation of financial statements; (x) processing and disbursement of payments for accounts and trade payables; (xi) assistance in recruiting orthodontists; (xii) preparation of statistical data and analyses of Center operations; (xiii) legal services for the Center's routine operations; and (xiv) various consulting advice. (BSA at ¶1.1).

The BSA explicitly states that "OCA is not authorized or qualified to engage in any activity that may be deemed or construed to constitute 'the practice of dentistry' under the laws of the State of Alabama." (BSA at ¶1.2). Still, OCA held exclusive control over Amason's orthodontic revenues and controlled the disbursement of funds from the practice's bank account. (BSA at ¶1.8). In addition, OCA owned Amason's office equipment and furnishings and leased these items to Amason. (BSA at ¶1.4). The BSA, however, provided that the office equipment and furnishings were to be under the "exclusive control" of Amason. (BSA at ¶1.4). OCA also had a duty to consult with Amason on all of the services it provided. (BSA at ¶1.3).

In the BSA, both parties agreed to covenants not to compete. (BSA at ¶¶ 5.1-5.2). The BSA was to last for a term of 25 years. (BSA at ¶4.1). The BSA also contained a choice of law provision

3

which stated that the laws of Alabama shall govern the validity and interpretation of the agreement. (BSA at ¶8.5).

   **C.   Service fee arrangement**

Under the BSA, Dr. Amason agreed to pay OCA according to a detailed formula. For the first 36 months the fee was to be the difference of the following amounts:

   (1) Patient Revenue, less

   (2) the Initial Minimum PC Amount, less

   (3) the amount, if any, by which the Initial

   Alternative PC Amount Exceeds the Initial Minimum PC

   Amount.

(BSA at ¶3.1). "Patient Revenue" is defined as 24.12% of the aggregate total balance of all fees and charges paid by patients, plus a portion of each patient contract. (BSA at ¶3.1(c)(viii)). The "Initial Minimum PC Amount" means $37,945 annually. (BSA at ¶3.1(c)(v)). The "Initial Alternative PC Amount" means the aggregate sum of (A) the Base Compensation Amount, plus (B) 50% of the Net Operating Margin for the applicable period. (BSA at ¶3.1(c)(iv)). The "Base Compensation Amount" is $83.33 per patient hour. (BSA at ¶3.1(c)(i)). The "Net Operating Margin" is the total amount of money collected in patient revenue, minus the sum of the following expenses: (1) Center expenses; (2) the Base Consulting Fee; (3) the Base Compensation Amount; and (4) 50% of

4

the Total Acquisition Cost. (BSA at ¶3.1(c)(vi)). The "Base Consulting Fee" is $22.22 per patient hour. (BSA at ¶3.1(c)(ii)).

After the first 36 months, the fee was to be the difference of the following amounts:

(i) Patient Revenue, less

(ii) the sum of (A) the Base Compensation Amount, plus

(B) 50% of the Net Operating Margin.

(BSA at ¶3.1(b)).

**D.  Procedural Background**

On March 14, 2006, OCA and its subsidiaries filed for bankruptcy. On May 19, 2006, the plaintiffs sued OCA seeking declaratory relief and damages for breach of contract and breach of fiduciary duty. (R. Doc. 1-3). OCA counterclaimed, seeking declaratory relief that the contract was valid, and damages for breach of contract, conversion, unjust enrichment, and quantum meruit. (R. Doc. 90). Plaintiffs filed for summary judgment in Bankruptcy Court, on the grounds that the BSA was illegal under Alabama law, and Judge Brown denied the motion for the reasons assigned at oral argument. *In re OCA, Inc., et al.*, No. 06-1128 (Bankr. E.D. La. May 2, 2007). On November 5, 2007, after discovery was completed in the Bankruptcy Court, the Court issued an Order withdrawing the reference to the Bankruptcy Court. (R. Doc. 74). On March 28, 2008, Amason moved for summary judgment

on the issue of whether the BSA is invalid and unenforceable under Alabama law. (R. Doc. 91). The Court found that the BSA violated both the Alabama Dental Practices Act, Ala. Code § 34-9-9, and the Alabama professional corporation statute, Ala. Code § 10-4-388. The Court also found that the provisions of the BSA in violation of the statutes were not severable, and thus, that the agreement was not enforceable.

**II. Legal Standard**

A district court has considerable discretion to grant or deny a motion for reconsideration. *See Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993). A court's reconsideration of an earlier order is an extraordinary remedy, which should be granted sparingly. *See Fields v. Pool Offshore, Inc.*, No. Civ. A. 97-3170, 1998 WL 43217, at *2 (E.D. La. Feb. 3, 1998), *aff'd*, 182 F.3d 353 (5th Cir. 1999); *Bardwell v. George G. Sharp, Inc.*, Nos. Civ. A. 93-3590, 93-3591, 1995 WL 517120, at *1 (E.D. La. Aug. 30, 1995). The Fifth Circuit has held that a motion for reconsideration "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet v. HydroChem Inc.*, 367 F.3d 473, 478-79 (5th Cir. 2004). A Rule 59(e) motion "serve[s] the narrow purpose of allowing a party to

correct manifest errors of law or fact or to present newly discovered evidence." *Id.* at 479 (quotation omitted). The Court must "strike the proper balance" between the need for finality and "the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co.*, 6 F.3d at 355. To succeed on a motion for reconsideration, a party must "'clearly establish either a manifest error of law or fact or must present newly discovered evidence.'" *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) (quoting *Pioneer Natural Res. USA, Inc. v. Paper, Allied Indus., Chem. & Energy Workers Int'l Union Local 4-487*, 328 F.3d 818, 820 (5th Cir. 2003)).

### III. Discussion

OCA avers that reconsideration is warranted because the Court committed several manifest errors of law. Specifically, OCA argues that the Court committed the following errors: (1) improperly deciding factual issues relating to whether a partnership existed and whether the BSA violated the Dental Practices Act; (2) improperly finding that a partnership with a dentist violates Alabama's professional corporation statute; (3) improperly finding that the BSA could not be reformed. The Court will address OCA's arguments in turn.

## A. Factual issues

OCA contends that the Court erred in deciding several factual issues. First, OCA asserts that the Court erred in determining that the parties intended to create a partnership. OCA asserts that the express terms of the BSA show that the parties did not intend to create such a relationship. Second, OCA contends that the Court improperly resolved factual issues relating to the management and control of Amason's practice. Third, OCA argues that the Court improperly determined that the parties were sharing profits, despite the provision in the BSA providing that the agreement did not represent the division of fees.

OCA has not shown that the Court committed a manifest error of law. While OCA purportedly argues that the Court improperly decided genuine issues of material fact, OCA's actual argument is that the Court misconstrued the terms of the BSA. Under Alabama law, if a court is faced with a contract issue, it first must determine whether the contract is ambiguous. *McLemore v. Hyundai Motor Mfg. Alabama, LLC*, --- So.2d ---, 2008 WL 4531796 at *6 (Ala. 2008) (citing *Alfa Life Ins. Corp. v. Johnson*, 822 So.2d 400, 404-05 (Ala. 2001)). Whether the contract is ambiguous is a question of law. *Id.* at *7 (citing *Ex parte Gardner*, 822 So.2d 1211, 1217 (Ala. 2001)). If the terms of a contract are plain

and unambiguous, the construction of the contract and its legal effect are questions of law that the court may decide on summary judgment. *Id.*

In construing the BSA, the Court did not make factual findings as to the parties' intent. Rather, the Court determined that the agreement was unambiguous as a matter of law. The Court determined that the BSA created a partnership under Alabama law because it contained a profit-sharing provision and provided OCA with a level of control that showed it was a co-owner in the enterprise. The Court did not consider whether the parties *intended* to create a partnership, because intent is not determinative of whether a partnership exists under Alabama law. *See* Ala. Code § 10-8A-202 ("an association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intended to form a partnership.").

The Court also did not make factual findings with regard to OCA's management and control of the practice. The Court was simply construing the legal effect of the unambiguous terms of the contract. Although the BSA contained various disclaimers stating that Amason had complete control over the practice, in substance, the BSA gave OCA a high degree of control over the operation. OCA controlled the practice's finances (BSA at ¶¶1.7-

9

1.8). OCA was responsible for employing and training office staff, and it limited Amason's ability to recruit associate orthodontists for the practice. (BSA at ¶¶1.6 and 5.8). OCA was also responsible for providing and maintaining office space, marketing and advertising, and administering the practice's payroll. (BSA at ¶1.1). OCA handled all bookkeeping tasks for the practice and handled all billing and collections. (BSA at ¶¶1.7-1.9). It maintained the insurance for the Center premises and equipment (BSA at ¶6.2) and had the power to negotiate managed care contracts with health maintenance organizations on behalf of the practice. (BSA at ¶1.10). OCA leased the practice's office space and provided the furniture and equipment for the office. (BSA at ¶¶1.4-1.5). OCA controlled the Center's dress code and hours of operation. (BSA at ¶2.6). OCA also restricted the orthodontist's ability to practice outside of the agreement for the BSA's 25-year term and for two years after the BSA's termination. (BSA at §5.2). Based on the foregoing provisions, the Court determined that OCA effectively controlled the business aspects of the practice. The Court's construction of the unambiguous terms of the agreement was thus a proper determination at the summary judgment stage.

The Court also did not make a factual finding with regard to the fee provision. OCA claims that the Court engaged in fact-

finding when it determined that the parties were sharing profits. But the Court did not construe an ambiguous provision of the agreement when it determined that the parties shared profits. The Court merely explained the service fee provision for what it was - a profit-sharing provision. In actuality, the fee OCA received under the formula was equal to 50% of the profits minus the orthodontist's base compensation fee, plus OCA's reimbursement for various expenses. This can be demonstrated as follows. The amount OCA received in excess of costs can be called OCA's net fee. In the illustration, OCA's net fee is represented as $x$, expenses as $y$, Patient Revenue as $z$, and the orthodontist's Base Compensation Amount as $b$. The Service Fee was equal to Patient Revenue minus the sum of the Base compensation amount plus 50% of the Net Operating Margin. The Net Operating Margin was equal to Patient Revenue minus expenses (including Center Expenses, the Base Consulting Fee, the Base Compensation Amount, and 50% of the Total Acquisition Cost of furniture). Thus the Service Fee can be described as: $z - (b + 0.5(z - y))$. The Service Fee included OCA's net fee plus its reimbursement for expenses, and thus can also be described as: $x + y$. This financial arrangement is represented by $x + y = z - (b + 0.5(z - y))$. OCA's net fee ($x$) can be calculated with some simple algebra:

11

$$x + y = z - (b + 0.5(z - y))$$

$$x + y = z - (b + 0.5z - 0.5y)$$

$$x + y = z - b - 0.5z + 0.5y$$

$$x + y = 0.5z + 0.5y - b$$

$$x = 0.5z + 0.5y - y - b$$

$$x = 0.5z - 0.5y - b$$

$$x = 0.5(z - y) - b$$

As such, OCA's fee was 50% of the Net Operating Margin minus the Base Compensation Amount. OCA was receiving 50% of the profits, minus a fixed amount. Neither party disputed that OCA was paid in accordance with this arrangement. The Court thus did not decide any genuine issues of material fact in explaining that the service fee was essentially a profit-sharing provision.

In sum, the Court's decision was based on the legal effect of the unambiguous terms of the BSA, rather than the resolution of factual issues in the province of the jury. Accordingly, OCA has not shown that reconsideration is warranted.

### 2. Violation of the Alabama professional corporation statute

OCA also contends that the Court erred when it found that a partnership arrangement between an orthodontist and an unlicensed entity violated Alabama Code section 10-4-388. In its order, the Court found that such an arrangement violated the Alabama

professional corporation statute, which prevents an unlicensed person from owning a share in a professional corporation, because, as Amason's partner, OCA was effectively a co-owner of his orthodontics practice.  OCA has cited no cases to support its contention that such an arrangement does not violate the law.  Accordingly, the Court finds that OCA has not shown that the Court committed a manifest error of law in this regard.

### 3.   Reformation of the BSA

OCA asserts that the Court erred in determining that the illegal contract provisions were not severable.  OCA asserts that the provisions of the agreement that violate the Dental Practices Act can be severed from the agreement.  OCA does not dispute, however, that the agreement cannot be reformed if it creates a partnership in violation of Alabama law.  Because the Court did not reconsider its determination that the BSA created a partnership in violation of section 10-4-388, the agreement still cannot be reformed.

**IV. Conclusion**

For the foregoing reasons, the Court DENIES defendants' motion for reconsideration.

New Orleans, Louisiana, this __11th__ day of February, 2009.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE